UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHY HALL,

    Plaintiff,

                Case No.  1:14-CV-08

v.

                HON. ROBERT HOLMES BELL

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

    Defendant.

_____/

## **O P I N I O N**

In this action Plaintiff challenges Defendant's second termination of her long-term disability benefits.  For the reasons that follow, the administrative decision terminating benefits will be affirmed.

## **I.**

Plaintiff Kathy Hall, who was born in 1966, began working as a per capita technician in the accounting department of the Saginaw Chippewa Indian Tribal Casino in Mt. Pleasant, Michigan in 1998.  The Tribal Casino has a group long-term disability insurance plan ("the Plan") that is funded by a group long-term disability benefits insurance policy (Policy No. GLTD-599I) issued by Defendant United of Omaha Life Insurance Company ("United").

(AR 227-264.)[1]  Defendant United administered the Plan.  Under the Plan, long-term disability benefits begin after a 90-day Elimination Period.  (AR 229, 236, 248.)  Benefits end when the participant is no longer disabled.  (AR 249.)  For the first two years of asserted disability, disability is defined as the inability to perform "at least one of the Material Duties of your Regular Occupation."  (AR 231, 260.)  Thereafter, the test is the inability to perform "all of the Material Duties of any Gainful Occupation."  (*Id.*)  As a full-time employee of the Tribal Casino, Plaintiff was eligible to participate in the Plan.

Plaintiff began developing back pain in June 2010.  An MRI revealed that she had "grade I anterolisthesis" with "possible bilateral pars defects at the L5-S1 level," and "[d]egenerative disc disease with posterolateral disc bulge causing bilateral nerve root compromise" at the L5-S1 level.  (AR 538.)  Plaintiff continued working until February 16, 2011, when she went on leave for back surgery.   On February 16, 2011, Dr. Naman Salibi of Saginaw Valley Neurosurgery performed a lumbar fusion and laminectomy, including the insertion of an L5-S1 OptiMesh pedicle screw with bilateral pre-bent rods.  (AR 531-34.)  Dr. Salibi's postoperative diagnoses were bilateral L5 spondylolysis with first and second-degree spondylolisthesis and severe bilateral foraminal stenosis.  (AR 531.)

Plaintiff applied for long-term disability benefits under the Plan.  Defendant granted benefits beginning on May 18, 2011, 90 days after Plaintiff became disabled, and ending on

---

[1]The Administrative Record, which is found at ECF No. 10, will be cited as "AR" followed by a number corresponding to the Page ID# assigned to the record in the CM/ECF system.

May 29, 2011, when Plaintiff was released to return to work with restrictions. (AR 145-49.)[2] Plaintiff filed an administrative appeal of the termination of benefits.

Following her first back surgery, Plaintiff continued to have pain in her back and extremities.  Plaintiff received post-surgical care from Dr. Salibi's partner, Dr.  Gerald Schell.  (AR 344-367.)  On September 9, 2011, Dr. Schell reported to Dr. Vashista, Plaintiff's primary care physician, that a CT scan of that date showed poor stimulation of Plaintiff's interbody fusion at L5-S1.  (AR 349.)  On the same date, Dr. Schell reported that Plaintiff's lumbar spinal fusion had not healed.  (Def. Resp. Ex.  E, ECF No. 12.)  In October 2011, Dr. Schell suspected that there might be pseudarthrosis at the L5-S1 level and he began discussing potential surgical interventions with Plaintiff.  (AR 350.)

On November 11, 2011, Dr. R. Scott Lazzara evaluated Plaintiff for the Disability Determination Service in conjunction with Plaintiff's application for Social Security disability benefits.  (AR 85-89.)  With respect to Plaintiff's musculoskeletal system, Dr. Lazzara reported that Plaintiff had "no difficulty getting on and off the examination table, mild difficulty heel and toe walking, mild difficulty squatting, and mild difficulty standing on either foot.  Straight let raising is negative bilaterally.  There is no paravertebral muscle

---

[2]On May 27, 2011, Dr. Schell advised Defendant that Plaintiff was stable enough to return to work on May 29, 2011, with restrictions of no excessive bending and no lifting over 20 pounds.  (Def. Resp. Br. Ex. A, ECF No. 12.)  This report was referenced in the administrative record in this case (AR 145), and was part of the administrative record in *Hall v. United of Omaha Life Ins. Co.*, 1:12-CV-387 (W.D. Mich.) (*Hall I*).  Although Plaintiff's doctors released her to work with restrictions, it appears that Plaintiff's employer did not permit her to return to work. (Def.'s Br. at 2.)

spasm.  There is lumbar spine straightening and diminished space height." (AR 86.)  With respect to her neurological system, Dr. Lazzara noted that Plaintiff's "Cranial nerves are intact.  Motor strength is intact.  Muscle tone is normal.  Sensory is intact to light touch and pinprick.  The patient walks with a wide based gait without the use of an assistive device." (AR 88.) He concluded that although Plaintiff had diffuse tenderness over the peri-incisional area and over the facet joints, neurologically she appeared stable, her degree of impairment was "mild to moderate," and her prognosis was "fair to guarded depending on her surgical outcome." (AR 89.) Dr. Lazzara indicated in his supplemental report that Plaintiff's reflexes were normal, and that she could sit, stand, bend, stoop, carry, push, pull, squat and arise from squatting, and climb stairs, with some restrictions.  (AR 90.)

On December 30, 2011, Nurse Practitioner Reed noted that Plaintiff's pain had been increasing over the last two months, that she had to increase her narcotic usage, and that the pain was constant, sharp, and worse with standing or sitting.  (AR 353.)  Nurse Practitioner Reed advised Dr. Vashishta that Dr. Schell was scheduling Plaintiff for a revision surgery. (*Id.*)

On January 19, 2012, Plaintiff underwent a revision surgery to address what appeared to be "chronic intractable back pain with pseudarthrosis at L5-S1." (AR 738.) Dr. Schell performed an interbody fusion at L5-S1 with lateral interbody fusion at L5-S1 using hip bone autograft, structural allograft and a PEEK interbody implant.  (AR 739.)

At her first post-operative appointment on February 15, 2012, approximately one

month after the surgery, Nurse Practitioner Nicole Reed documented that Plaintiff was having problems with left foot pain that was worse with movement, buttock pain, and some tingling in her toes.  (AR 754.)

On March 5, 2012, Dr. Schell reported that Plaintiff's back pain is "markedly improved," but she had some burning dysesthesia in the left foot.  (AR. 755.)  Dr. Schell noted that a CT scan did "not demonstrate any evidence of retropulsion of the graft or foraminal stenosis.  Everything is in good position and alignment." (*Id.*)  Dr. Schell thought they needed "to give this more time to settle and heal," but that in light of her nerve irritation, they might try a nerve root injection to "help facilitate some of the nerve swelling that she is getting since that surgical intervention." (*Id.*)

On April 7, 2012, the Social Security Administration determined that Plaintiff became disabled under its rules on February 16, 2011, and the Plaintiff was entitled to disability benefits beginning August 2011.  (AR 548.)   The ALJ's decision, however, noted that improvement was expected:

> Medical improvement is expected with appropriate treatment.  Consequently, a continuing disability review is recommended in 12 months.  The claimant's [sic] underwent a second surgery that may prove over time to be successful in correcting the claimant's spinal impairments, thereby restoring much of her currently diminished functioning and capacity for work.

(AR 563.)

On March 9, 2012, Defendant upheld the May 2011 termination of Plaintiff's long-term disability benefits.  (AR 174.)  On April 23, 2012, Plaintiff filed an action in this Court

5

challenging the administrative determination.  *Hall v. United of Omaha Life Ins. Co.*, 1:12-CV-387 (W.D. Mich.)  (*Hall I*).

On April 30, 2012, Dr. Schell reported that "the severe burning type pain has dissipated out of the area of the ankle," and that "[f]or the most part she is neurologically stable" and "seems to be making good neurologic progress."  (AR 756.)

On July 11, 2012, Nurse Practitioner Reed documented Plaintiff's complaints of some rectal numbness, occasional infrequent stool leakage, numbness in her left and right toes, and left toe weakness.  (AR 757.)

An x-ray of Plaintiff's lumbar spine, three views, in August 20, 2012, revealed "[p]ostoperative changes at L5-S1 with a minimal anterolisthesis." (AR 748.)

On August 20, 2012, Dr. Schell reported that the intensity of Plaintiff's symptoms was "beginning to show some signs for some resolution." (AR 758.)  "Her x-rays are stable.  For the most part she seems to be coming along relatively well from neurologic perspective." (*Id.*)  "Neurologic status is stable."  (*Id.*)

On November 7, 2012, Plaintiff and Defendant reached a settlement in *Hall I.* Defendant agreed to reinstate Plaintiff's long term disability benefits from May 29, 2011, to date, and advised that they had approved her for ongoing benefits.  (AR 190-92.)  On November 19, 2012, the Court entered a "Consent Order of Dismissal" without prejudice in *Hall I.*  (AR 195; Case No. 1:12-CV-387, ECF No. 23).

On December 12, 2012, after Plaintiff's long-term disability benefits were reinstated

pursuant to the consent order, Plaintiff filed a Supplementary Report of Disability on which she reported that she was totally disabled from February 2011 to "current/indefinite." (AR 814.) She reported that she still had "extreme back and foot pain," and that "standing, bending, sitting, lifting and too much walking makes worse." (*Id.*)

An x-ray of Plaintiff's lumbar spine, three views, on January 8, 2013, concludes with "Impression: Post fusion at the lumbosacral junction. A complicating process is not apparent on these plain films." (AR 749)

On January 8, 2013, Plaintiff reported to Nurse Practitioner Felsing that she had ongoing left foot numbness and weakness, and pain in the tailbone if she sat in one position too long. (AR 759.) She reported, however, that overall the symptoms of intermittent low back pain and numbness through the left thigh that she was experiencing prior to surgery did feel a bit better. Nurse Practitioner Felsing reported:

> Physical exam reveals the patient to be seated comfortably today. Her gait is steady. Straight leg raise is negative. Dorsi/plantar flexion is strong and intact bilaterally. Incision is well healed.

(*Id.*) Nurse Practitioner Felsing also reported that Plaintiff "states she can live with her symptoms and does not seem overly aggravated by them." (*Id.*)

The same day, Nurse Practitioner Felsing filled out a Physical Capacities Checklist on Plaintiff's behalf. (AR 794-95.) The Checklist indicated that in an 8-hour workday, Plaintiff could sit for 3 hours in 1-hour intervals, walk for 2 hours in 1-hour intervals, and stand for 1 1/2 hours in 1/2 hour intervals; Plaintiff could do repetitive movements with her

7

right hand and foot, and left hand, but not her left foot; Plaintiff could constantly lift, carry, and push or pull up to 10 pounds and could occasionally lift, carry and push or pull 11-20 pounds; Plaintiff could constantly handle and finger; and Plaintiff could frequently climb stairs, and occasionally (for short episodes only) balance, stoop, bend, kneel, crouch, squat, crawl, reach forward, and reach overhead.  (AR  794.)

On February 4, 2013, Dr. Malcolm Field, a neurosurgeon at Saginaw Valley Neurosurgery, saw Plaintiff for a follow-up visit.  He advised Dr. Vashishta  that Plaintiff reported ongoing left foot numbness and weakness and pain in the tailbone if she sat in one position too long.  (AR 624.)  Her pre-surgery symptoms of low back pain and left thigh numbness were feeling a bit better.  (*Id.*)  She was seated comfortably, her gait was steady, her straight leg raise was negative, and her dorsi/plantar flexion was strong and intact bilaterally.  (*Id.*)  Dr. Field concluded that Plaintiff had not reached maximal medical improvement at the time, but that he expected fundamental changes within three to four months.  (AR 625.)  Dr. Field's medical prognosis for recovery was "good/stable."  (*Id.*)

On March 28, 2013, Defendant terminated Plaintiff's long term disability benefits a second time based on its determination that Plaintiff no longer met the definition of disability.  (AR 198-208.)  Plaintiff filed an administrative appeal.

On May 9, 2013, Dr. Lakshmana Madala, a pain management doctor, documented Plaintiff's complaints of lower back pain and sacroiliac joint pain.  (AR 394-96.) Dr. Madala reported that Plaintiff was in no acute distress; she used no assistive devices; her lumbosacral

8

spine movements were normal; flexion was not painful; extension produced only mild pain; she had mild paraspinal tenderness; and moderate joint sacroiliac joint tenderness that was greater on the left. (AR 395-96.)

On May 15, 2013, Plaintiff underwent a CT guided left sacroiliac injection. (AR 216.) On May 21, 2013, Dr. Schell noted the possibility of sacroiliitis on the left side. (AR 364.) He also noted that Plaintiff "was up to walking 5 miles a day and that is when things got aggravated." (*Id.*) Plaintiff reported that she occasionally had stabbing pain in her back, but Dr. Schell thought they could continue to treat her conservatively by repeating a sacroiliac injection or getting CT myelographic studies. (*Id.*) "But if she can tolerat[e] her pain, since she is not having neurologic deficits, we certainly can wait this out." (*Id.*)

On July 14, 2013, Dr. Schell performed another CT guided sacroiliac joint injection on Plaintiff. The same day, Dr. Schell updated his Physician Statement of Disability. Dr. Schell reported that "[d]espite surgical intervention, Mrs. Hall has not seen much in the way of medical improvement." (AR 216.) Dr. Schell noted that Plaintiff's benefits had been terminated on the basis of office notes completed by Nurse Practitioner Felsing and Dr. Field while Dr. Schell was on medical leave. Dr. Schell reported that Nurse Practitioner Felsing had only seen Plaintiff on one occasion and that Dr. Field had not physically examined Plaintiff. Dr. Schell stated that Plaintiff "has not received medical improvement and it is not my medical opinion that she could expect to see 'fundamental changes' in three to four months. Her medical conditions are longstanding and I do not see where her medical

9

prognosis at this time is either 'good' and/or 'stable.'" (AR 217.)  Dr. Schell noted that

Plaintiff continues to experience right leg cramping, left foot numbness and weakness, pain

in her tailbone with prolonged sitting, rectal numbness/bowel incontinence, left and right toe

numbness and weakness, burning dysesthesias in left foot, buttock pain, and left sided

weakness.  (AR 216.)  Dr. Schell concluded that Plaintiff "continues to be disabled from her

regular occupation as a Per Capita Technician and any other full-time occupation at this

time." (*Id.*)  According to Dr. Schell, the opinions of Dr. Field and Nurse Felsing on which

Defendant relied were substantially misinformed.  He stated that Plaintiff's lumbar spinal

fusion was not healed, that she was completely unstable, and that her medical prognosis was

neither good nor stable, and that she continued to be disabled from any full-time occupation.

(AR 215-17.)

Following receipt of Dr. Schell's Statement of Disability, Defendant sought an

independent medical record review from Dr. Kogan, a board certified neurologist.  In his

November 13, 2013, report, Dr. Kogan noted that Plaintiff's medical record after her revision

surgery "documents multiple symptoms," including persistent lower back pain, tailbone pain,

buttock pain, left leg pain, left foot pain, left arm pain, toe tingling, left and right toe

numbness, left lower extremity weakness, rectal numbness, and stool leakage.  (AR 77.)  Dr.

Kogan noted that there was no specific dermatomal or myotomal distribution documented,

and no specific proposed etiology for Plaintiff's symptoms.  (*Id.*)  He noted that Dr. Schell

documented in March 2012 that a CT scan showed everything in place.  According to Dr.

Kogan, this implied that there was no structural cause for Plaintiff's symptoms at that time. (*Id.*)  Dr. Kogan noted that CT guided sacroiliac joint injections gave Plaintiff significant, although temporary, relief from her new diagnosis of sacroiliitis.  Dr. Kogan identified inconsistencies in Dr. Schell's report based on the lack of a specific, unifying diagnosis for the Plaintiff's complaints after her revision surgery; the lack of specific structural causes for her symptoms on lumbar spine imaging after her revision surgery; indications in Dr. Schell's clinical notes that Plaintiff was neurologically stable; and evidence that Plaintiff's neurological status had improved to the point that she was walking five miles per day as of May 2013.  (AR 78-79.)  Dr. Kogan concluded that the records did not support Dr. Schell's opinion that Plaintiff was disabled from her own or any occupation.  (AR 80.)  Dr. Kogan did not find any direct evidence of symptom magnification, exaggeration, or secondary gain documented in the record, although he did note that Plaintiff refused a psychiatry consult in March 2011.  (AR 80.)

On December 5, 2013, Defendant upheld the termination of Plaintiff's long term disability benefits as "appropriate."  (AR 59-63.)  Defendant concluded that there was no medical support for restrictions and limitations that would prevent Plaintiff from performing the material duties of her regular occupation beyond March 27, 2013.  Plaintiff is able to perform the material duties of her regular occupation due to inconsistencies in the medical record and reports from Dr. Schell indicating that on various occasions she was neurologically stable.  (AR 62.)

Plaintiff filed this action challenging Defendant's decision to terminate her long-term disability benefits pursuant to Section 502(a)(1)(B) of the Employees' Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

## II.

Plaintiff filed this action under Section 502(a)(1)(B) of the Employees' Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), challenging Defendant's decision to terminate her long-term disability benefits.  There is no dispute that the Plan is an employee welfare benefit plan governed by ERISA, nor is there any dispute that Plaintiff was a participant in the Plan.  (Answ. ¶¶ 4, 5.)

The parties agree that the Court should apply the de novo standard of review.  (Joint Status Report, ECF No. 7; Case Management Order, ECF No. 9.) "'When applying a de novo standard in the ERISA context, the role of the court reviewing a denial of benefits 'is to determine whether the administrator . . . made a correct decision.' The administrator's decision is accorded no deference or presumption of correctness." *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 368 (6th Cir. 2009) (quoting *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)).

In ERISA cases such as this, the Court bases its de novo review solely upon the administrative record.  *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).  This means that the Court is "'required to consider only the facts known to the plan administrator' at the time of the decision." *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 658

12

(6th Cir. 2013) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996)).

## III.

On de novo review, this Court is required to determine whether, as of March 28, 2013, Plaintiff was disabled from performing any of the material duties of her past occupation, and whether Defendant's decision to terminate benefits as of March 28, 2013, was correct in light of the administrative record.

## A. Relevant Time Period

At various times in her briefs, Plaintiff has asserted that Defendant effectively determined she was disabled from her first surgery on February 16, 2011, until November 19, 2012, the date of the Consent Order. Plaintiff contends that Defendant has improperly concentrated on medical records from the time period surrounding the first and second surgeries through November 2012, a time period that Defendant has effectively conceded Plaintiff was disabled. Plaintiff in effect is arguing that her medical records prior to November 2012 are not relevant to the Court's review.

The Court disagrees. There is no evidence that Defendant ever conceded that Plaintiff was disabled as of November 2012. Defendant entered into a settlement of a contested case. The settlement resulted in the entry of a consent order that placed Plaintiff back on benefits. It does not appear, however, that Defendant undertook a review of Plaintiff's full medical file at that time, or that it made any specific findings or admissions concerning Plaintiff's

status at that time.[3]   Accordingly, for purposes of reviewing Defendant's termination of
Plaintiff's disability status in March 2013, the Court will focus on Plaintiff's medical records
from after her second surgery in January 2012.

**B.  Relevant Records**

Plaintiff objects to Defendant's reference to medical records that were not a part of
the administrative record filed in this case.   Plaintiff's objection is not well-taken.   The
records Defendant has attached to its response brief were  part of the administrative record
in *Hall I*, so there can be no dispute that this information was known to the plan administrator
at the time of the March 2013 determination.  *See Judge*, 710 F.3d at 658.

**C.  Failure to Place Greater Weight on Treating Physician's Opinion**

Plaintiff asserts that Defendant's decision to terminate her benefits was not objectively
correct because the evidence of disability from her treating neurosurgeon, Dr. Schell, far
outweighs the contrary opinion of Defendant's retained file reviewer, Dr. Kogan, who did
not personally examine or treat Plaintiff.

Plaintiff's argument raises issues concerning the weight should be accorded the
opinion of a treating physician, the weight to be accorded the opinion of a file reviewer, and
the potential conflict of interest when a plan administrator relies on its own hired medical
expert.

---

[3]Defendant has asserted that it made the decision to continue benefits without the
benefit of all of the post-revision surgery records.

The Court does not take issue with Plaintiff's assertion that the opinions of treating physicians will ordinarily outweigh the contrary opinions of physicians who have merely undertaken a cold review of the medical file.  However, the Court notes, as a preliminary matter, that the treating physician is not entitled to any special deference:  the treating physician rule that applies in Social Security actions does not apply in the ERISA context. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 293 (6th Cir. 2005).  "[W]hile plan administrators may not arbitrarily reject or refuse to consider the opinions of a treating physician, they 'are not obligated to accord special deference to the opinions of treating physicians.'" *Id.* (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003)).  In addition, the Sixth Circuit has held that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Id.* at 296.  Nevertheless, whether an  independent expert hired by the administrator has a possible conflict of interest, and whether a doctor has physically examined the claimant, are factors the Court must bear in mind in evaluating the administrator's decision. *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 507-08 (6th Cir. 2005).

The Court will not place great weight on the opinion of a treating physician if it is not supported by the medical records.  Even in the social security context where the treating physician rule is applied, deference is accorded the treating physician's opinion "only if it is based on objective medical findings and is not contradicted by substantial evidence to the contrary." *Jackson v. Metro. Life*, 24 F. App'x 290, 293 (6th Cir. 2001) (citations omitted).

In addition, the Court is "not required to accept a treating physician's conclusory opinion on the ultimate issue of disability." *Id.*

It is with these principles in mind that the Court considers Plaintiff's contention that the opinion of Dr. Schell, her treating neurosurgeon, far outweighs the contrary opinion of Dr. Kogan, Defendant's retained medical records reviewer.

Dr. Schell's July 2013 opinion that Plaintiff is totally disabled from any occupation is not consistent with Dr. Schell's statements after the revision surgery that everything was in good position and alignment, that the intensity of Plaintiff's symptoms was showing signs of resolution, that she was making good neurologic progress, that her x-rays were stable, and that her neurologic status was stable. Dr. Schell's opinion that Plaintiff is totally disabled is not supported by any test results or any new objective medical findings. Dr. Schell noted areas in which Plaintiff continued to experience weakness, numbness, and pain, but he did not explain what was causing those symptoms, or the extent of those symptoms. Dr. Schell's July 2013 Statement of Disability is not consistent with the opinions of his nurse practitioner and partner regarding Plaintiff's abilities and prognosis. Although Dr. Schell attempted to discount their opinions because Nurse Practitioner Felsing had only seen Plaintiff on one occasion, and Dr. Field had not physically examined her, Dr. Schell did not explain what they overlooked, or why their opinions were in correct.

Plaintiff asserts that Dr. Schell's July 2013 Statement of Disability includes findings that she has a "severe L5-S1 disk pathology," that "her lumbar spinal fusion is not healed,"

that "she is completely unstable at this point in time." This language is found in Dr. Schell's July 2013 opinion, but it all relates to Plaintiff's condition before her revision surgery in January 2012. (Phys. Statement of Disability ¶¶ 8, 14, AR 216-17.) Dr. Schell did not present any medical findings from after Plaintiff's January 2012 revision surgery. Dr. Schell did not address any of his own clinical notes or letters he wrote to Plaintiff's primary physician after the revision surgery, nor did he address any of the diagnostic tests that were done after the revision surgery. He did not address the success of the revision surgery, or whether the hip bone auto graft had properly fused. Overall, Dr. Schell fails to give any basis for his determination that Plaintiff's medical prognosis is neither good nor stable, and that she continues to be disabled.

Although Dr. Kogan did not examine Plaintiff, his report contains a more thorough report of the records from all of Plaintiff's medical practitioners and diagnostic tests. Dr. Kogan's report also highlights significant ways in which Dr. Schell's July 2013 Statement of Disability is inconsistent from Dr. Schell's prior reports and the other medical evidence. The Court does not agree, under the circumstances, that Dr. Schell's opinion on the ultimate issue of disability as expressed in the July 2013 Statement of Disability is entitled to any greater weight than the opinion of Dr. Kogan.

Plaintiff asserts that "the record is studded with a plethora of various positive electrodiagnostic confirmations of her disability since her first surgery." (Pl. Br. 19.) Although the failure of Plaintiff's first surgery is documented in the record, Plaintiff has not

17

identified any diagnostic confirmations of her disability after her revision surgery.

**D.  Conflict of Interest**

Where the plan administrator both determines eligibility for benefits and pays benefits out of its own pocket, this dual role creates a conflict of interest that should be considered by the reviewing court as a factor in determining whether the plan administrator has correctly denied benefits. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  This conflict of interest may be reflected in the plan's choice of physicians.  For example, physicians "repeatedly retained" by a plan may have an incentive to make a finding of "not disabled" in order to benefit the plan and preserve their own consulting arrangement. *Black & Decker Disability Plan*, 538 U.S. at 832.

> [A]lthough "routine deference to the opinion of a claimant's treating physician" is not warranted, we may consider whether "a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled'" as a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician.

*Kalish*, 419 F.3d at 508; *see also Calvert*, 409 F.3d at 292 (noting that a plan's conflict of interest provides it with a clear incentive to contract with individuals who are inclined to find in the plan's favor).

Nevertheless, the Court will not assume that a doctor hired an paid by the plan is biased simply because the plan has a conflict.  Conclusory allegations of bias with respect to a plan-chosen reviewer are not sufficient to permit a conclusion that it was improper to rely on that reviewer.  Some evidence, such as statistical evidence that the reviewer

consistently opined the claimants were not disabled, is required. *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 989 (6th Cir. 2010) (citing *Kalish*, 419 F.3d at 508). Plaintiff has presented no facts to show that Dr. Kogan had a long-term relationship with Defendant, that he had a history of finding claimants not disabled, or that there were any other circumstances that would suggest that Dr. Kogan's opinion was biased. Accordingly, the Court does not find that Dr. Kogan's opinion was motivated by a conflict of interest.

Plaintiff notes that in cases governed by ERISA, the administrator is required to review and balance the quantity and quality of the medical evidence and the opinions on both sides of the issue rather than cherry-picking the record for evidence that supports denial. *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361-62 (6th Cir. 2002) (holding that administrator acted arbitrarily and capriciously when it sent only a single report to the reviewing doctor). Here, Plaintiff has presented no facts to suggest that Defendant failed to provide Dr. Kogan with all relevant records, or that it cherry-picked the record in order to find that Plaintiff was not disabled.

**E.  Failed Back Syndrome**

Plaintiff asserts that she is disabled from performing her previous occupation because she is suffering from "failed back syndrome." In support of this argument, Plaintiff has submitted an article from Wikipedia that is based on peer-reviewed medical studies.

Defendant opposes Plaintiff's attempt to bring in evidence of a condition that is not described in the administrative record.

19

Plaintiff acknowledges Dr. Schell did not use the term "failed back syndrome" to describe her condition.  Nevertheless, she contends that he could have done so because it is essentially a euphemism for "pseudarthrosis," a term that Dr. Schell did use.  (Pl. Br. 20.) Plaintiff contends that it is not improper to bring in information regarding a well-recognized medical condition in order to explain the record, as evidenced by the fact that the record already includes numerous Wikipedia and other medically-oriented articles defining terms used in the record.  (Pl. Reply Br. 5.)

Although Plaintiff contends that failed back syndrome is a euphemism for pseudarthrosis, Plaintiff has not presented evidence that this is so.  Plaintiff's evidence of failed back syndrome is not properly before this Court because the syndrome was not described or diagnosed in the administrative record.  Moreover, although Dr. Schell opined that Plaintiff was suffering from pseudarthrosis when he performed her revision surgery, Dr. Schell did not opine that she continued to suffer from pseudarthrosis after he performed the revision surgery.  Accordingly, pseudarthrosis is not a term that requires explanation in order to understand the medical record after Plaintiff's revision surgery.

## F.  Functional Vocational Testing

Finally, Plaintiff contends that Defendant's termination of her long-term disability benefits is erroneous because Defendant did not justify its determination by reference to functional vocational testing.  Plaintiff contends that the denial letter did not indicate the source of the conclusion that Plaintiff's appropriate "restrictions and limitations" were

anything specific to her condition as opposed to the generic restrictions and limitations applied to sedentary work.

Plaintiff cites *Rabuck v. Hartford Life*, 522 F. Supp.2d 844 (W.D. Mich. 2007) (Scoville, M.J.), in support of his contention that an insurer is required to independently justify its benefits determination on both medical and vocational grounds. In *Rabuck*, the Court determined that the company's determination that the plaintiff could perform his previous occupation as a company president was arbitrary and capricious where the administrator relied on a report from someone with no vocational expertise who incorrectly referred to plaintiff's occupation as "engineer" and never assessed the potential impact of plaintiff's high stress occupation of company president. *Id.* at 880.

In contrast to *Rabuck*, the administrator in this case clearly did obtain a professional assessment of Plaintiff's prior occupation. In *Hall I*, a vocational rehabilitation consultant performed an occupational analysis which looked at the elements and tasks related to Plaintiff's job, analyzed it in terms of occupational data, and concluded that the job was sedentary. (*Hall I*, ECF No. 16-5, Page ID#549-50.) Defendant referenced the vocational rehabilitation consultant's analysis in its September 14, 2011, denial and its March 9, 2012 denial of appeal that included in the administrative record in this case. (AR 147, 174.) Plaintiff concedes that her job before she stopped working in February 2011 was sedentary in nature. (Pl. Br. 1.) Plaintiff submitted the Physical Capacities Checklist completed on January 8, 2013, by Nurse Practitioner Felsing and Dr. Lazzara's November 11, 2011, range

of motion study to Defendant for its consideration in determining her ability to perform her past occupation. (AR 83-92, 793-96.)

Upon de novo review of the administrative record, the Court concludes that Defendant's determination that Plaintiff was no longer disabled from performing her sedentary job was not erroneous. The medical records support a finding that she was disabled prior to her revision surgery due to the failure of her first fusion to heal. However, the records indicate that after her revision surgery, her condition improved, a CT scan did not demonstrate any evidence of retropulsion of the graft, or any foraminal stenosis, and everything appeared to be in good position and alignment. Later x-rays revealed that she was neurologically stable, and that there was no evident complicating process. She also reported that she was walking five miles. Her treating physician's opinion that she was disabled from any full time employment was not supported by any diagnostic testing or diagnosis of any problems related to the revision surgery. Based on a de novo review of the administrative record, the Court concludes that Defendant's determination that Plaintiff was no longer disabled from performing her sedentary job was not erroneous. Accordingly, the Court will uphold Defendant's administrative decision terminating Plaintiff's long-term disability benefits as of March 28, 2013.

An order and judgment consistent with this opinion will be entered.

Dated: June 23, 2015                    /s/ Robert Holmes Bell
                                        ROBERT HOLMES BELL
                                        UNITED STATES DISTRICT JUDGE

22